IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

THE HUMANE SOCIETY OF THE
UNITED STATES et al.,

                   Plaintiffs,

    v.

CARLOS M. GUTIERREZ et al.,

                  Defendants,

OREGON DEPARTMENT OF FISH
AND WILDLIFE and WASHINGTON
DEPARTMENT OF FISH AND
WILDLIFE,

                Intervenor-Defendants.

No. CV 08-357-MO

OPINION AND ORDER

**MOSMAN, J.**,

    The Humane Society of the United States, the Wild Fish Conservancy, and several

individual plaintiffs challenge the National Marine Fisheries Service's ("NMFS") decision

authorizing the States of Oregon, Washington, and Idaho to kill certain California sea lions at

Bonneville Dam.  The sea lions are preying on endangered and threatened Columbia River

salmon and steelhead ("salmonids") at the dam.  NMFS made the decision pursuant to section

120 of the Marine Mammal Protection Act ("MMPA"), which allows "the intentional lethal taking of individually identifiable pinnipeds[1] which are having a significant negative impact on the decline or recovery of salmonid fishery stocks."  16 U.S.C. § 1389(b)(1).

While this case involves, at a substantive level, the interplay of three federal environmental statutes (the MMPA, the National Environmental Policy Act ("NEPA"), and the Endangered Species Act ("ESA")), it is fundamentally an Administrative Procedure Act ("APA") challenge to NMFS's decision.  In such cases, I must uphold the challenged action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

Plaintiffs contend NMFS's decision was contrary to law because the agency failed to apply the correct legal standard for authorizing a lethal taking of sea lions under MMPA section 120.  They also argue the decision was arbitrary and capricious because it is factually indefensible and inconsistent with other agency decisions (under NEPA and the ESA) involving salmonids.

Plaintiffs further claim NMFS violated NEPA by (1) not preparing an environmental impact statement ("EIS") and (2) not preparing an adequate environmental assessment ("EA").  In general, NEPA requires agencies to evaluate the environmental consequences of their actions. That is accomplished through an EA and, if necessary, an EIS.  Here, NMFS completed an EA, and made a finding of no significant impact ("FONSI").  Therefore, no EIS was necessary. Essentially, NMFS determined that killing a small number of California sea lions would not significantly impact the total population of California sea lions and would marginally benefit

---

[1]  California sea lions are pinnipeds.

salmonids. Plaintiffs contend the decision not to prepare an EIS was flawed, and that, in any event, the EA was flawed because it did not address certain environmental impacts. Viewed through the prism of APA review, plaintiffs' argument is that NMFS's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.*

Plaintiffs filed a Motion for Summary Judgment (#67) and defendants and intervenor-defendants filed Cross-Motions for Summary Judgment (## 73, 76, and 80). Defendants also filed a Motion to Strike (#79). For reasons explained below, I GRANT defendants' Cross-Motions for Summary Judgment and therefore DENY plaintiffs' Motion for Summary Judgment. I further GRANT IN PART and DENY IN PART defendants' Motion to Strike (#79).

Viewing NMFS's actions in light of the APA's deferential standard, NMFS properly evaluated whether individually identifiable pinnipeds were having a significant negative impact on the decline or recovery of salmonids. Its decision in this case was not arbitrary and capricious in comparison with other agency decisions under NEPA and the ESA. Furthermore, NMFS was not required to prepare an EIS because beneficial impacts do not trigger the need for an EIS. Finally, some of the plaintiffs' complaints about the EA are factually incorrect, and the remaining concerns were adequately addressed by the agency.

## DISCUSSION

**I.    <u>Standard of Review</u>**

Section 706 of the APA governs judicial review of the MMPA and NEPA. 5 U.S.C. § 706; *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1205 (9th Cir. 2004) ("Because the statutes . . . do not contain separate provisions for judicial review, our review is governed by the APA."). The scope of judicial review under section 706 is narrow, and a court must uphold an agency's

action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

An agency's decision is arbitrary and capricious "only if the agency relied on factors Congress did not intend it to consider, 'entirely failed to consider an important aspect of the problem,' or offered an explanation 'that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc) (quoting *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1157 (9th Cir. 2006)). If the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made," the court must uphold the agency's action. *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983); *see also City of Sausalito*, 386 F.3d at 1206.

Moreover, the court generally must be "at its most deferential" when reviewing scientific judgments and technical analyses within the agency's expertise. *See Balt. Gas & Elec. Co.*, 462 U.S. at 103. It should not "act as a panel of scientists that instructs the [agency] . . . , chooses among scientific studies . . . , and orders the agency to explain every possible scientific uncertainty." *Lands Council*, 537 F.3d at 988. The court should also "conduct a 'particularly deferential review' of an 'agency's predictive judgments about areas that are within the agency's field of discretion and expertise . . . as long as they are reasonable.'" *Id.* at 993 (quoting *Earthlink, Inc. v. FCC*, 462 F.3d 1, 12 (D.C. Cir. 2006)). And "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Id.* at 1000 (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989)).

PAGE 4 OPINION AND ORDER

II.    **Plaintiffs' First Claim: Violations of the MMPA and the APA**

A.    *MMPA Section 120*

The MMPA protects "certain species and population stocks of marine mammals."  16 U.S.C. § 1361(1).  It generally prohibits the unauthorized "take" of marine mammals.  *Id.* § 1371(a).  "'[T]ake' means to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal."  *Id.* § 1362(13).  However, the MMPA provides several narrow exceptions to the broad take prohibition.  *Id.* § 1371(a).

In 1994, Congress added an exception to the MMPA, section 120, that addresses pinniped predation on salmonids.  *See id.* § 1389.  Section 120 permits the Secretary of Commerce to authorize states to lethally take certain pinnipeds.  "A State may apply to the Secretary to authorize the intentional lethal taking of individually identifiable pinnipeds which are having a significant negative impact on the decline or recovery of salmonid fishery stocks which . . . have been listed as threatened species or endangered species . . . ."  *Id.* § 1389(b).[2]  Before authorizing a lethal taking, the Secretary must consider:

(1)    population trends, feeding habits, the location of the pinniped interaction, how and when the interaction occurs, and how many individual pinnipeds are involved;

(2)    past efforts to nonlethally deter such pinnipeds, and whether the applicant has demonstrated that no feasible and prudent alternatives exist and that the applicant has taken all reasonable nonlethal steps without success;

(3)    the extent to which such pinnipeds are causing undue injury or impact to, or imbalance with, other species in the ecosystem, including fish populations; and

---

[2]  However, "[t]he Secretary shall not approve the intentional lethal taking of any pinniped from a species or stock that is—(1) listed as a threatened species or endangered species . . . ; (2) depleted . . . ; or (3) a strategic stock."  *Id.* § 1389(e).

(4)     the extent to which such pinnipeds are exhibiting behavior that presents an ongoing threat to public safety.

*Id.* § 1389(d).

Because section 120 clearly and unambiguously communicates Congressional intent, I do not evaluate the legislative history. Plaintiffs point out that Congress "recognize[d] that a variety of factors may be contributing to the declines of these stocks" and intended that "the current levels of protection afforded to seals and sea lions under the Act should not be lifted without first giving careful consideration to other reasons for the decline" in salmonid stocks. (Pls.' Mem. in Supp. Summ. J. (#71) 3-4 (quoting H.R. Rep. No. 103-439 at sec. 10 (1994)).) While this statement may be useful in some other context, the statutory text is the authoritative statement of Congress's intent. *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) ("As we have repeatedly held, the authoritative statement is the statutory text, not the legislative history or any other extrinsic material. Extrinsic materials have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms."); *see also Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."). Congress outlined what the Secretary must consider when deciding whether to authorize a lethal take under section 120. *See* 16 U.S.C. § 1389(d). Section 120 is clear and unambiguous; the Secretary does not need to consider "other reasons for the decline" of salmonid stocks. *See id.*; *see also Humane Soc'y of the U.S. v. Dep't of Commerce*, No. 96-623, slip op. at 11-12 (D.D.C. Apr. 13, 1999) (rejecting the Humane Society's argument that "lethal

PAGE 6 OPINION AND ORDER

removal of sea lions [was] a futile gesture unless the State [of Washington] simultaneously address[ed] other systemic problems at the [Ballard] Locks").  Thus, I confine my analysis of section 120 to the statutory text, and I decline plaintiffs' invitation to rely on the legislative history.

> **B.**    ***California Sea Lions at Bonneville Dam***

In 2001, the U.S. Army Corps of Engineers began monitoring pinniped predation on ESA listed endangered and threatened salmonids at Bonneville Dam.  (Admin. R. 4 at 3-4.)  Although Bonneville Dam is approximately 140 miles up the Columbia River, pinnipeds were beginning to congregate at the dam to prey on salmonids that were trying to swim up the fish ladders.  The Corps "tracked numbers of sea lions (including how many are new versus repeat visitors), the number of days individual sea lions are present in the area, and the numbers of salmonids consumed."  (*Id.* at 4.)  Table 1 summarizes some of the Corps's data.  (*See id.* at 4-5.)

| Table 1: Observed Pinniped Predation on Salmonids at Bonneville Dam | | | | | | |
|---|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006** | **2007** |
| **California Sea Lions at the Dam** | 30 | 106 | 101 | 80 | 72 | 69 |
| **Other Pinnipeds at the Dam** | 1 | 5 | 4 | 5 | 13 | 11 |
| **Total Pinnipeds at the Dam** | 31 | 111 | 105 | 85 | 85 | 80 |
| **Salmonids Taken by Pinnipeds** | 1,010 | 2,329 | 3,533 | 2,920+ | 3,023 | 3,859 |
| **Salmonids Passing Through the Dam** | 284,733 | 217,185 | 186,804 | 82,006 | 105,063 | 88,474 |
| **Pinniped Predation as % of Run Size** | .4 | 1.1 | 1.9 | 3.4+ | 2.8 | 4.2 |

Because the total number of salmonids taken by pinnipeds was seemingly increasing, the States of Oregon, Washington, and Idaho attempted, through nonlethal means, to deter pinniped predation on salmonids.  (*Id.* 392 at 1-5 to 1-6.)  The nonlethal deterrence was ineffective.  (*Id.*)  The States consequently applied, under section 120, for authority to lethally remove a number of

PAGE 7 OPINION AND ORDER

California sea lions.  (*Id.* at 1-6.)

In response to the States' application, NMFS formed a "pinniped-fishery interaction task force" and solicited public comments on the States' application.  (*Id.* 4 at 6.)  The Task Force began meeting on September 4, 2007; the eighteen Task Force members included scientists, conservation and fishing organizations, Indian Treaty Tribes, the States, Federal agencies, and other organizations.  (*Id.* 149 app. A, at 1-2.)  Seventeen of the eighteen Task Force members concluded California sea lions at Bonneville Dam are having a "significant negative impact on the decline or recovery of threatened and endangered salmonid fishery stocks . . . ."  (*Id.* 4 at 9.)  Only the Humane Society's representative disagreed.  (*Id.* 149 app. C, at 48.)

NMFS then reviewed the Task Force's recommendation, the States' application, and the public comments.  (*Id.* 4 at 7.)  NMFS concluded that certain individually identifiable California sea lions were having a "significant negative impact on the decline or recovery of at-risk salmonid fishery stocks."  (*Id.* 4 at 8.)  NMFS partially approved the States' application to lethally remove certain California sea lions on March 14, 2008.  (*Id.* 4.)

## C. *NMFS's Definition of "Significant" Under the MMPA Section 120*

NMFS defined "significant" for purposes of section 120, because Congress did not define it in the MMPA.  NMFS identified three principal factors to determine whether individually identifiable pinnipeds are "having a significant negative impact on the decline or recovery of salmonid fishery stocks."  16 U.S.C. § 1389(b)(1).  The three factors are:

(1)    The predation is measurable, growing, and could continue to increase if not addressed;

(2)    The level of adult salmonid mortality is sufficiently large to have a measurable effect on the numbers of listed adult salmonids contributing to the

productivity of the affected ESUs/DPSs; and

(3)     The mortality rate for listed salmonids is comparable to mortality rates from other sources that have led to corrective action under the ESA.

(Admin. R. 4 at 10.)

NMFS's definition of "significant" is not contrary to the language of the MMPA. Plaintiffs argue: "Glaringly absent from the agency's list of criteria for determining 'significance' is what effect the sea lion feeding actually has on the *decline or recovery of salmonids*—which, of course, is the actual legal test required under section 120 of the MMPA . . . ." (Pls.' Mem. in Supp. Summ. J. (#71) 14-15.)  Plaintiffs would likely be correct if NMFS's criteria included only whether "adult salmonid mortality is sufficiently large to have a measurable effect on the numbers of adult salmonids." (Admin. R. 4 at 10.)  However, salmonid mortality from pinniped predation must "have a measurable effect on the numbers of listed adult salmonids contributing to the *productivity* of the affected" stocks.  (*Id.* (emphasis added).)  Here, NMFS used "productivity" as a proxy for "decline or recovery."

NMFS's definition also identifies a rough benchmark to help determine whether the impact on productivity is significant.  The third factor states: "The mortality rate for listed salmonids is comparable to mortality rates from other sources that have led to corrective action under the ESA." (*Id.*)  NMFS thus interpreted "significant negative impact on the decline or recovery of salmonid fishery stocks" to mean a measurable negative impact on productivity that is comparable to other impacts that required corrective action under the ESA.

Because Congress did not define "significant negative impact on the decline or recovery of salmonid fishery stocks," I must give deference to NMFS's reasonable interpretation of those

terms. *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984) ("[I]f

the statute is silent or ambiguous with respect to the specific issue, the question for the court is

whether the agency's answer is based on a permissible construction of the statute."). NMFS's

definition is not contrary to the language of MMPA section 120. It defines the key terms. And,

contrary to plaintiffs' argument, it defines "decline or recovery of salmonid fishery stocks" by

equating it to productivity. It also provides a rough benchmark to determine whether the impact

on productivity is significant. Under APA review, NMFS's definition is not irrational or

impermissible.[3] The definition "is based on a permissible construction of the statute." *Chevron*,

467 U.S. at 843. NMFS's definition is therefore not "arbitrary, capricious, an abuse of discretion,

or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

### D.    *NMFS's Application of MMPA Section 120*

Based on the definition discussed above, NMFS rationally applied MMPA section 120's

requirements. Plaintiffs argue: "[T]he Act requires the agency to show that (1) there is an

'impact,' (2) that it is 'significant,' (3) that it is 'negative,' and (4) that it is attributable to the

specific 'individually identifiable pinnipeds' that are targeted for killing. . . . [T]he agency here

has impermissibly 'blue-penciled out' three of the four statutorily required conditions . . . ." (Pls.'

Mem. in Supp. Summ. J. (#71) 18 (citation omitted).) The administrative record indicates,

however, that NMFS evaluated all of the MMPA section 120 requirements.

First, plaintiffs have imposed an artificial and disjunctured reading of section 120's

---

[3] "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron*, 467 U.S. at 843 n.11.

requirements by parsing out the phrase "significant negative impact" into three separate parts.

Further, there is sufficient evidence in the record supporting NMFS's decision that pinniped

predation constitutes a "significant negative impact" on salmonids.  In 2007 pinnipeds preyed on

at least 4.2% of the run.  That percentage represents observed predation only.  (Admin. R. 4 at 4-

5.)  Actual predation is likely higher.  (*Id.* at 10 (". . . 86 California sea lions at the dam can

consume up to 17,458 salmonids annually"); *id.* ("The proportion of salmonids with pinniped

scarring rose from 11 percent in 1999 to 37 percent in 2005.").)

This predation is having a significant negative impact on salmonid mortality rates.  As

indicated in the record, pinniped predation is resulting in "fewer fish surviving to spawn, thus

reducing spawning potential and recruitment."  (*Id.* 392 at 1-5.)  Observed and estimated

mortality rates are at levels "that can have a significant effect on the survival and recovery of the

listed stocks."  (*Id.* 4 at 11.)  Based on the definition discussed above, NMFS thus rationally

concluded that pinnipeds are having a significant negative impact on the productivity—i.e.,

decline or recovery—of listed salmonids.

Finally, NMFS concluded the predation can be attributed to individually identifiable

pinnipeds.  (*See id.* at 7-12.)  It identified specific sea lions that prey on salmonids at Bonneville

Dam.  (*Id.* 149 app. D; *id.* 369 at 10)  It concluded those particular sea lions contribute most to

predation at the dam.  (*Id.* 4 at 12.)  Thus, NMFS concluded (1) there is a significant and negative

impact, (2) that is attributable to individually identified pinnipeds.

Because application of MMPA section 120 involves data analysis and technical expertise,

I must be deferential to NMFS's determinations.  *See Balt. Gas & Elec. Co.*, 462 U.S. at 103.

NMFS analyzed specific data and information in the record to conclude that individually

PAGE 11 OPINION AND ORDER

identifiable pinnipeds are having a significant negative impact on salmonids.  Under APA

review, NMFS's analysis and application of section 120 was not irrational.  Thus, its application

of MMPA section 120 was not "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law."  5 U.S.C. § 706(2)(A).

### E.    *NMFS's Decision Was Not Otherwise Arbitrary and Capricious*

### 1.    NMFS's Qualitative Standard Is Reasonable

The Marine Mammal Commission ("MMC") recommended that NMFS use a quantitative

standard to assess pinniped predation at Bonneville Dam.  (Admin. R. 392 at 2-4 to 2-5.)

Plaintiffs argue NMFS should have adopted the quantitative standard to evaluate whether

individually identifiable pinnipeds are having a significant negative impact on salmonid stocks.

(Pls.' Mem. in Supp. Summ. J. (#71) 16-17.)  MMPA section 120 does not require a quantitative

standard, and NMFS ultimately adopted a more qualitative standard rather than the approach

suggested by the MMC.

Here, the MMC and NMFS had conflicting views.  "When specialists have conflicting

views, an agency must have discretion to rely on the reasonable opinions of its own qualified

experts . . . ."  *Marsh*, 490 U.S. at 378.  NMFS considered the MMC's suggestions.  However,

NMFS concluded: "The experience at Ballard Locks in Washington suggests that where human

caused conditions cause adult salmonids to congregate and delay, California sea lions can

effectively consume a majority of the salmonids present."  (Admin. R. 290 at 15485.)  The

Ballard Locks section 120 authorization relied on a more quantitative standard of ten percent, and

the sea lions effectively wiped out the steelhead population.  (Admin. R. 392 at P-5, 4-4.)  Thus,

based on the record and past experiences, NMFS concluded a more qualitative standard was

necessary.  Under APA review, NMFS's decision deserves deference.  MMPA section 120 does

not require a quantitative standard, *see* 16 U.S.C. § 1389, and in light of the record, NMFS's

chosen standard is not "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law."  5 U.S.C. § 706(2)(A).

> **2.    NMFS's Decision Was Not Arbitrary and Capricious In Light of Other Decisions Under NEPA and the ESA**

Plaintiffs next argue that pinnipeds take of salmonids is much smaller than other takes of

salmonids that have been determined not to be significant under NEPA and the ESA.  (Pls.'

Mem. in Supp. Summ. J. (#71) 21-22.)  Before addressing plaintiffs argument, I must resolve

two matters about how plaintiffs and defendants discuss and interpret the administrative record.

First, NMFS reasonably concluded that pinniped predation on salmonids is larger than

plaintiffs contend.  Plaintiffs argue that pinniped predation is between .4% and 4.2% of the

salmonid run.  (Pls.' Mem. in Supp. Summ. J. (#71) 1.)  However, the administrative record

assumes predation is higher.  Table 1 lists observed predation only, which the administrative

record makes clear.  The record notes that observers do not witness all acts of predation.

(Admin. R. 290 at 15485.)  Using scientific analysis, NMFS concluded that pinniped predation at

Bonneville Dam could be as high as 17,458 salmonids annually (approximately 12.6% of the

spring Chinook and 22.1% of the steelhead run).  (*Id.*)  Thus, NMFS concluded predation was

higher than .4% to 4.2% of the run but less than 12.6% to 22.1% of the run.  I must be deferential

to scientific findings within NMFS's expertise.  *See Balt. Gas & Elec. Co.*, 462 U.S. at 103.

Based on the record, NMFS can reasonably and rationally conclude pinniped predation is higher

than the actual, observed predation.

Second, despite plaintiffs arguments, NMFS reasonably concluded pinniped predation is growing. Citing figures from 2005-07, plaintiffs argue that pinniped predation at Bonneville Dam has stabilized. (Pls.' Mem. in Supp. Summ. J. (#71) n.1.) However, I must be particularly deferential to NMFS's predictive calculations as long as they are reasonable. *See Lands Council*, 537 F.3d at 993. NMFS can rationally assess all available data in making its decisions; it is not restricted to plaintiffs' proposed time frame. NMFS can, in other words, look at a six-year trend in the data; it is not required to limit review to a two- or three-year snapshot. Merely glancing at Table 1 makes clear NMFS can rationally conclude predation is growing. Assessing all the data and information in the record indicates NMFS's conclusion is not arbitrary and capricious.

a.    Pinniped Predation v. Fishing or Hydro-power Dams

Plaintiffs argue that NMFS's decision was arbitrary and capricious because it concluded pinnipeds' take of salmonids was significant under the MMPA but has previously determined fishermen's take and hydro-power dams' take were not significant under NEPA or the ESA. (Pls.' Mem. in Supp. Summ. J. (#71) 22-27.) Plaintiffs have not identified any authority to support the proposition that an agency must explain and discuss its (or another agency's) previous decisions under one statutory scheme when making decisions under another statutory scheme. Indeed, this demand would unduly burden agency decision-making and discretion by imposing requirements not mandated by relevant statutes or regulations. *See Lands Council*, 537 F.3d at 993 ("[W]e are not free to impose on the agency our own notion of which procedures are best . . . . Nor may we impose procedural requirements not explicitly enumerated in the pertinent statutes." (quotes and citations omitted)). Such an imposition is particularly problematic given the different standards required by each statutory framework.

PAGE 14 OPINION AND ORDER

Here, because the MMPA, NEPA, and the ESA are entirely different statutory schemes, NMFS was not obligated to discuss and explain previous decisions under NEPA and the ESA. MMPA section 120 addresses a narrow issue—the relationship between pinnipeds and salmonids only.  *See* 16 U.S.C. § 1389.  However, NEPA addresses the human environment as a whole.  *See* 42 U.S.C. § 4332(C).  And the ESA focuses on whether an action will jeopardize the continued existence of a species.  *See* 16 U.S.C. § 1536(a)(2).  The statutes' different foci necessarily require different inquiries and analyses.  NMFS therefore was not obligated to discuss and explain previous decisions under NEPA or the ESA when it determined pinnipeds are having a significant negative impact on salmonids at Bonneville Dam.

Regardless, because there are practical and rational differences between pinnipeds' interactions with salmonids and fishermen's interactions with salmonids, NMFS's decision under MMPA section 120 is not inconsistent with decisions about fishing under NEPA or the ESA. The States regulate fishing.  They can change the allowed fishing take (Admin. R. 4 at 11), and the allowed fishing take is down.  Between 1938 and 1973, fishing took an average of 55% of the run.  (*Id.* 392 at P-6.)  Since 1979, fishing averaged just over 8% of the run.  (*Id.*)  Currently, fishing take varies according to abundance calculations.  (*Id*. 290 at 15485.)  In contrast, as discussed, pinniped predation is growing, and the States have not been able to control or regulate it.  (*See id.* 4.)  Based on these statistics and factors, pinniped predation and fishing are practically and rationally different.  Thus, although NMFS is not obligated to discuss and explain how previous decisions about fishing under NEPA and the ESA are consistent with its decision under MMPA section 120, the decisions are not inconsistent.

The same is true about previous decisions relating to hydro-power dams under NEPA or

PAGE 15 OPINION AND ORDER

the ESA.  The take calculations from hydro-power dams also included smolts, which have a much higher mortality rate than adult salmonids.  (*See id.* 392 at 3-32.)  Also, the hydro-power system incorporates survival improvements to offset impacts.  (*Id.*)  More importantly, the interaction of the hydro-power system with salmonids involves a radically different set of concerns and balancing than the interaction of pinnipeds and salmon under the MMPA.  Thus, the factual and practical differences indicate NMFS's decision under MMPA section 120 is not inconsistent with previous decisions about hydro-power systems under NEPA or the ESA.[4]

> b.    "Other Reasons for the Decline"

Plaintiffs also argue NMFS did not adequately address or consider other reasons for the decline in salmonid stocks, which were determined not to be significant under either NEPA or the ESA.  Plaintiffs state: "Therefore, NMFS not only failed to give 'careful consideration' to the other mortality factors salmon face in the Columbia, but also reached a conclusion that flies in the face of more than a decade of past administrative decisions concerning the relative significance of those 'other reasons for the decline' of salmonids."  (Pls.' Mem. in Supp. Summ. J. (#71) 22.)

As mentioned, MMPA section 120 does not require the agency to address the "other reasons for the decline."  Plaintiffs' argument relies on the legislative history of section 120.  However, because section 120 is clear and unambiguous, it is inappropriate to rely on the legislative history.  *See Exxon Mobil Corp.*, 545 U.S. at 568 ("Extrinsic materials have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's

---

[4]  Plaintiffs also point to other decisions under the MMPA where NMFS issued permits to take a species at levels higher than 4%.  However, "the significance of any given percentage of impact is a species-specific inquiry."  (Fed. Defs.' Memo. in Supp. Summ. J. (#77) 17.)

understanding of otherwise ambiguous terms.").

The closest relevant opinion cited by the parties concluded that NEPA did not require the Department of Commerce to address "other reasons for the decline" in salmonid stocks. In *Humane Society v. Department of Commerce*, the Humane Society made a similar argument. Judge Kollar-Kotelly stated:

> In essence, the Plaintiffs object to the modest scope of the proposal submitted by the State, believing that lethal removal of sea lions is a futile gesture unless the State simultaneously addresses other systemic problems at the [Ballard] Locks. Rather than assailing any deleterious effect on the sea lion population, the Plaintiffs attack the wisdom of the proposal because sea lion predation is one of many factors presently contributing to the steelhead's decline. Dissatisfied with the States' decision to address only a small aspect of the steelhead problem, the Plaintiffs have challenged the scope of NMFS' review of the State's proposal.

*Humane Soc'y of the U.S.*, No. 96-623, slip op. at 11-12. Judge Kollar-Kotelly ultimately rejected the Humane Society's argument. *Id*. at 27 (denying the Humane Society's Motion for Summary Judgment and granting the Department of Commerce's Motion for Summary Judgment).

MMPA section 120 addresses a relatively narrow interaction between two species—pinnipeds and salmonids. NEPA and the ESA, which generally provide broader frameworks for assessing the "other reasons for the decline," address different issues. As discussed above, because the inquires and factual circumstances are so different, the agency could reasonably conclude that an action is not significant for purposes of NEPA or the ESA but is significant for purposes of MMPA section 120. Thus, even if NMFS had to consider "other reasons for the decline," its decision to authorize a lethal take of California sea lions under MMPA section 120 does not "fl[y] in the face of more than a decade of past administrative

PAGE 17 OPINION AND ORDER

decisions."

In sum, NMFS's definition and application of MMPA section 120 are not arbitrary and capricious. NMFS was not obligated to discuss and explain other decisions made under other statutory schemes. Given the factual circumstances, NMFS's decision was not inconsistent with previous decisions under other statutory schemes. Therefore, I GRANT defendants' and intervenor-defendants' Motions for Summary Judgment on plaintiffs' first claim.

### III.   **Plaintiffs' Second Claim: Violations of NEPA and the APA**

#### A.    *NEPA's Requirements*

NEPA requires that federal agencies adequately assess the impact of federal actions "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008). NEPA's purpose is twofold: (1) ensure the agencies carefully consider information about significant environmental impacts and (2) guarantee relevant information is available to the public. *Roberston v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989); *Ctr. for Biological Diversity*, 538 F.3d at 1185.

Under NEPA, if the applicable regulations do not categorically require the preparation of an EIS, then an agency prepares an EA. *See Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000). The EA "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement [EIS] or a finding of no significant impact [FONSI]." 40 C.F.R. § 1508.9(a)(1). "If there is a substantial question whether an action 'may have a significant effect' on the environment, then the agency must prepare an Environmental Impact Statement (EIS)." *Ctr. for Biological Diversity*, 538 F.3d at 1185 (citing *Blue Mountains*

PAGE 18 OPINION AND ORDER

*Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998)).

Determining whether an action will have a significant effect on the environment requires the agency to consider both "context" and "intensity." 40 C.F.R. § 1508.27; *see also Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 731 (9th Cir. 2001). "Context . . . delimits the scope of the agency's action, including the interests affected." *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 731. Intensity refers to the "severity of impact." 40 C.F.R. § 1508.27(b).

The following should be considered in evaluating intensity:

(1)    Impacts that may be both beneficial and adverse. . . .

(2)    The degree to which the proposed action affects public health or safety.

(3)    Unique characteristics of the geographic area . . . .

(4)    The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5)    The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6)    The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7)    Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. . . .

(8)    The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9)    The degree to which the action may adversely affect an endangered or threatened species or its habitat . . . .

(10)    Whether the action threatens a violation of Federal, State, or local law

or requirements imposed for the protection of the environment.

*Id.*

**B.**   ***NMFS Prepared an EA and Issued a FONSI***

NMFS prepared an EA in response to the States' MMPA section 120 application.  (*See* Admin. R. 392.)  The EA discusses and assesses four alternatives: (1) no action, (2) non-lethal deterrence only, (3) lethal take after non-lethal deterrence, and (4) lethal take without non-lethal deterrence.  (*Id.* at 2-1 to 2-18.)  It also considered but did not analyze in detail five other alternatives.  (*Id.* at 2-17.)

After preparing a draft EA, NMFS provided for a 30-day public comment period from January 11, 2008 to February 18, 2008.  (*Id.* at P-1.)  It received more than 3,500 comments.  (*Id.*)  It considered and responded to the comments before drafting a final EA and making a final decision.  (*Id.* at P-1 to P-2.)  NMFS then issued a FONSI (*Id.* 393), and authorized the States to lethally remove California sea lions under alternative three (*Id.* 347).

**C.**   ***A Significance Finding Under MMPA Section 120 Does Not Require a Significance Finding Under NEPA***

Plaintiffs contend: "Because the agency itself argues that sea lion feeding is 'significant' and believes that on balance, the effect of removing sea lions will eliminate a 'significant' threat to salmon, it cannot then claim that these purported significant benefits do not trigger its obligation to prepare an EIS. . . . [S]ignificant 'beneficial' environmental impacts trigger the need for an EIS."  (Pls.' Mem. in Supp. Summ. J. (#71) 29.)

A finding of significance under MMPA section 120 does not necessarily require a finding of significance under NEPA.  As discussed above, MMPA section 120 and NEPA have entirely

different foci, and NMFS can rationally conclude there is a significant impact under MMPA

section 120 but not a significant impact under NEPA.  It was Emerson who wrote, "a foolish

consistency is the hobgoblin of little minds."  Ralph Waldo Emerson, "Self-Reliance," *Essays:*

*First Series* (1841).  The bare fact that both NEPA and the MMPA employ some variation of the

concept of "significance" does not make the analysis under the two statutes identical.  In the

FONSI, NMFS concluded: "There will likely be an increase in survival . . . of listed adult

salmonids under the proposed action because of the permanent removal of individually

identifiable predatory California sea lions."  (Admin. R. 393 at 8-2.)  While NMFS concluded

that removing the sea lions would be beneficial to salmonids, it did not conclude that the

beneficial impact would be significant under NEPA.  (*See* Fed. Defs.' Memo. in Supp. Summ. J.

(#77) 24-25.)  Therefore, NMFS was not required to prepare an EIS.

> ### D.    *An EIS Is Not Required If an Action Has Beneficial Impacts Only*

An action that, overall, has no significant detrimental effect on the environment does not

require the preparation of an EIS.  In *Bering Strait Citizens for Responsible Resource*

*Development v. U.S. Army Corps of Engineers* ("*BSC*"), the Ninth Circuit held the Corps was not

required to prepare an EIS for a mining project near Nome, Alaska.  524 F.3d 938 (9th Cir.

2008).  Although the project would permanently destroy 346.5 acres of existing wetlands,

mitigation measures would "result in the reclamation of 106 acres of previously-disturbed

wetlands and the creation of 70 acres of new wetlands" (a "net loss of 170.5 acres of wetlands").

*Id.* at 944.  The Corps also contended the project would benefit the local economy because Nome

has a high unemployment rate.  *Id.*  BSC argued the Corps should have prepared an EIS and

addressed concerns about "air quality, biological resources, and water quality."  *Id.* at 957.  The

PAGE 21 OPINION AND ORDER

court weighed the balance of the benefits and harms, as "[a]n EIS must be prepared if 'substantial questions are raised as to whether a project . . . may cause significant degradation of some human environmental factor.'" *Id.* at 956 (citation omitted). The court concluded: "On balance, . . . the [mine project] has no significant detrimental effect on the environment in and near Nome. Accordingly, the Corps was not required to prepare an EIS . . . ." *Id*. at 957.

Other precedent also indicates an EIS is not required for an action that has beneficial impacts only. NEPA requires an EIS if there are substantial questions about "'whether a project . . . may cause significant degradation of some human environmental factor.'" *See id.* at 956 (quoting *Blue Mountains Biodiversity Project*, 161 F.3d at 1212). This has been the law in the Ninth Circuit since at least 1973. *See Save Our Ten Acres v. Kreger*, 472 F.2d 463, 467 (9th Cir. 1973) ("[I]f the court finds that the project may cause a significant degradation of some human environmental factor (even though other environmental factors are affected beneficially or not at all), the court should require the filing of an impact statement . . . ."), *overruled on other grounds by Envtl. Def. Fund, Inc. v. Corps of Engineers of U.S. Army*, 492 F.2d 1123, 1139 (9th Cir. 1974). The Ninth Circuit requires an EIS if there is "degradation of some human environmental factor." It is nonsensical to discuss "beneficial degradation"; therefore, no EIS is required if an action has beneficial impacts only. *See also Friends of Fiery Gizzard v. Farmers Home Admin.*, 61 F.3d 501, 504 (6th Cir. 1995) ("'Intensity,' [40 C.F.R.] § 1508.27(b) explains, means 'the severity of impact.' This choice of adjectives is significant, we think; one speaks of the severity of *adverse* impacts, not *beneficial* impacts.").

Here, the EA concludes lethally taking a limited number of California sea lions will not cause a "significant degradation of some human environmental factor." First, the California sea

lion population will not be significantly affected.  Second, as discussed more fully below, the

Steller sea lion population will not be significantly affected.  Third, the salmonid population will

likely benefit from the removal of California sea lions at Bonneville Dam.  The EA thus

concludes, and plaintiffs do not compellingly argue otherwise, that the lethal removal of

California sea lions will not significantly degrade the human environment.  Therefore, NMFS is

not required to prepare an EIS.

### E.    *NMFS Is Not Otherwise Required to Prepare an EIS*

Plaintiffs also argue the lethal removal of California sea lions is highly controversial and,

therefore, NMFS should prepare an EIS.  (Pls.' Mem. in Supp. Summ. J. (#71) 32.)  In the NEPA

context, "highly controversial" has a specific meaning.  An action is "controversial" only when

"substantial questions are raised as to whether a project . . . may cause significant degradation of

some human environmental factor or there is a substantial dispute about the size, nature, or effect

of the . . . action."  *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 736 (quotations and citations

omitted).  Here, plaintiffs have not raised any evidence that there are substantial questions about

the potential degradation of some human environmental factor.  Neither have they identified any

evidence that there is a dispute about the "size, nature, or effect of the . . . action."  Furthermore,

the science behind NEPA's analysis and conclusion is not controversial.  Plaintiffs argument is,

simply, that killing sea lions is controversial.  While killing sea lions may be controversial in the

conventional sense, it is not controversial in the NEPA context.  Therefore, NMFS is not

otherwise required to prepare an EIS.

### F.    *NMFS Prepared an Adequate EA*

Plaintiffs also argue that the EA is inadequate for two reasons.  First, "the agency failed to

fully address . . . the potentially deadly impacts to federally threatened Steller sea lions that frequent Bonneville Dam." (Pls.' Memo. in Opp'n to Defs.' Cross Mot. for Summ. J. (#88) 27.) Second, the agency did not address "the impacts to local sea lion viewing opportunities that will result once hundreds of sea lions are permanently removed from the Bonneville Dam." (*Id.*)

>    1.    **The EA Sufficiently Addressed the Potential Impact to Steller Sea Lions**

The EA adequately addressed the potential impacts on Steller sea lions. Plaintiffs argue: "[A]llowing sea lions to be shot and killed in the water may result in 'some Steller sea lions [to] be mistakenly shot' because 'it may be difficult for marksmen . . . to distinguish between California and Steller sea lions' since 'animals moving in three dimensions in the water are difficult to target.'" (Pls.' Mem. in Supp. Summ. J. (#71) 31 (quoting Admin. R. 392 at 4-9); *see also* Pls.' Mem. in Opp'n to Defs.' Cross Mot. for Summ. J. (#88) 27.) Here, plaintiffs either misinterpret or misrepresent the EA. Plaintiffs quote from alternative four; however, NMFS proposed alternative three and authorized the states to proceed under that alternative. (Admin. R. 392 at 2-12; *id.* 4.)

Under alternative three, the EA specifically states: "[I]t is unlikely that a marksman would shoot any sea lion other than one on the list of predatory sea lions." (Admin. R. 392 at 4-7.) "The potential for the accidental lethal taking of a Steller sea lion would be negligible under this alternative because the conditions for lethal removal (marksman on shore, animals hauled out or in close proximity to shore, and sufficient time to identify the animal to be lethally removed) optimize the opportunity to positively identify the target animal." (*Id.* at 4-8.) Plaintiffs argument is therefore factually incorrect.

Plaintiffs also argue the EA does not adequately address the impact on Steller sea lions because, during the pendency of this litigation, two Steller sea lions were caught in live traps and died of unknown causes.[5]  (Pls.' Mem. in Supp. Summ. J. (#71) 32, n.15; Summ. J. Hr'g Tr. 36.) NEPA requires an agency to evaluate "reasonably foreseeable" impacts.  *Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy*, 383 F.3d 1082, 1090 (9th Cir. 2004) ("NEPA[] require[s] that agencies assess only 'reasonably foreseeable' risks." (citing 40 C.F.R. §§ 1502.16, 1508.8(b))).  Plaintiffs have not identified one public comment that  raises the possibility that Steller sea lions may die of unknown causes in live traps.  The record does not otherwise indicate it is foreseeable.  Although unfortunate, there is no basis to conclude the accidental death of two Steller sea lions is significant under NEPA.  *See Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1010-11 (9th Cir. 2006) ("[NEPA requires] agenc[ies] to consider the degree of adverse effect on a species, not the impact on individuals of that species.").[6]  Thus, the death of two Steller sea lions from unknown causes (1) was not foreseeable and (2) is not significant under NEPA.

_____

[5]  Defendants objected to the introduction of this, as well as other, extra-record evidence in their Motion to Strike (#79).  As later discussed, Defendants' Motion to Strike is denied in part, as to the evidence relating to the Stellar sea lions, and granted in part as to the remaining evidence.

[6]  Recent Ninth Circuit precedent relating to preliminary injunctions is also informative. In a recent en banc decision, the Court said: "[W]e decline to adopt a rule that *any* potential environmental injury *automatically* merits an injunction, particularly where . . . we have determined that the plaintiffs are not likely to succeed on the merits of their claims."  *Lands Council*, 537 F.3d at 1005.  Thus, if a plaintiff's likelihood of success on the merits is low, the killing of an individual sea lion does not merit a preliminary injunction.  This conclusion is even stronger in the NEPA context because NEPA is concerned about a species, not an individual animal.  *See Envtl. Prot. Info. Ctr.*, 451 F.3d at 1010-11.

PAGE 25 OPINION AND ORDER

2.    **The EA Sufficiently Addressed Tourism and Recreation**

Plaintiffs' also contend that the EA is flawed because NMFS failed to specifically consider sea lion viewing opportunities.  (Pls.' Mem. in Supp. Summ. J. (#71) 34.)  I find this argument unpersuasive as the EA adequately evaluated the potential impacts to tourism and recreation.

Parties are obligated to alert the agency as to their position and contentions.  *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978).  A party forfeits arguments that are not raised during the administrative process.  *See Dept. of Transp. v. Public Citizen*, 541 U.S. 752, 764-65 (2004).  However, when making comments, the claimant does not need to raise the issue using precise legal formulations, as long as there is enough clarity that the decision-maker understands the issue.  *See Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 899-900 (9th Cir. 2002).  As such, alerting the agency in general terms will be enough if the agency was given "a chance to bring its expertise to bear to resolve a claim."  *Id*. at 900.

There is some question here as to whether plaintiffs adequately raised the issue of sea lion viewing opportunities during the administrative process, such that NMFS was appropriately notified of this particular concern.  The agency received more than 3,500 public comments during the comment period to the draft EA.  (Admin. R. 392 at P-1.)  Among those comments, plaintiffs now highlight two emails in support of their argument that NMFS did not adequately consider sea lion viewing opportunities.[7]  (Summ. J. Hr'g Tr. 88.)  The first comment asked the

---

[7]  Defendants' argue that plaintiffs' waived this argument because there was no comment on sea lion viewing during the administrative process.  (Fed. Defs.' Memo. in Supp. Summ. J. (#77) 32.)  While there is a question as to whether the concerns are sufficient to put the agency on

question, "[w]hat about all the eco-tourism [sic] that are attracted to the area for [s]ealions?"

(Admin. R. 204.) The second comment noted that "[m]y biggest thrill while kayaking is seeing

the wildlife, and little compares to seeing a sea lion 'up close and personal.'" (B. Price Email,

Summ. J. Hr'g Tr. 38.) In short, plaintiffs rely on two sentences, in two emails, out of thousands

of submitted comments to suggest that the EA failed to consider an important impact to the

proposed action.

      Plaintiffs do not point to other comments during the administrative process that raise

these concerns. It is also worthwhile to note that the Humane Society, in its eighteen-page letter

commenting on the draft EA, did not mention concerns related to sea lion viewing opportunities.

(Admin. R. 282.) Furthermore, the issue is not so obvious that NMFS should have considered it.

*See Public Citizen*, 541 U.S. at 765 (stating that an obvious oversight may excuse the obligation

to raise it). In particular, there is no indication that the same issue arose in the Ballard Locks

case in Washington state, the closest factual situation to the present circumstances.

      Moreover, even if I assume that the comments were sufficient to alert the agency to the

potential impact on sea lion viewing opportunities, the EA adequately evaluated the possible

---

notice, plaintiffs did not waive this argument to the extent that Bernadette Price sent one of the
emails during the comment period and also submitted an affidavit in support of the instant case.
Nonetheless, at oral argument, plaintiffs for the first time brought the two emailed comments to
the court's attention. Plaintiffs did not cite or refer to these specific emails in briefing their
complaint, motion, or reply for summary judgment. Instead, in their effort to establish standing,
plaintiffs suggest that some of its members, including Ms. Price, enjoy watching sea lions and in
some instances, "have developed a personal relationship with some of the animals, in the same
way people develop a relationship with a family pet." (O'Driscoll Decl. ¶17; Price Decl. ¶¶ 4-6.)
The merits of the viewing argument is addressed above. There is no evidence before the court
that the impact of taking individual pinnipeds, which some plaintiffs may have "developed a
personal relationship" with, was raised during the administrative process. In any event, this
"personal relationship" impact, whether with a sea lion, or a tree, or other individual member of a
species, is likely not cognizable under NEPA.

impacts on tourism and recreation. Indeed, among the sixteen different resources that could be affected by the proposed action, NMFS specifically examined the potential impacts to tourism and recreation. (Admin. R. 392 at 3-40 to 3-41). The Bonneville Dam area drew approximately 2.74 million recreational visits in 2005. (*Id*. at 3-40.) Significantly, the primary public use for the Bonneville Lock and Dam is fishing, and the EA addressed in detail the potential impacts to this main form of recreation. (*Id*. at 3-40.) The EA also included information as to other types of recreation, ranging from kayaking to nature observation. (*Id*. at 3-40 to 3-41.) Further, NMFS did not substantially limit the analysis but rather acknowledged that a "wide variety of other recreation uses occur on all sites." (*Id*. at 3-41.) Based on these concerns, the EA evaluated options to minimize the amount of time and disruption on public activities near the dam. (*Id*. at 4-26 to 4-27.) After analyzing the main types of recreation and the efforts to mitigate disruption to these activities, NMFS could rationally conclude that tourism and recreation would not be substantially affected by the proposed action.

Further, given the narrow focus of the proposed action, there is no evidence to suggest that pinniped viewing opportunities will be appreciably limited overall. Viewing of sea lions remains possible down the length of the Columbia River, save for a small section of river close to Bonneville Dam. (*Id*. at 1-1, 2-12.) Steller sea lions are not targeted, and even if disturbed by activities at the dam, are expected to thrive on the lower Columbia River. (*Id*. 393 at 8-3.) Both sides acknowledge that there is a healthy, robust population of California sea lions, between 237,000 and 300,000, and growing. (*Id*. 357 at 4.) As predicted by NMFS, even with the removal of some pinnipeds, there will still be both local and wide-range abundance of California sea lions. (*Id*. 393 at 8-3.) Moreover, some number of California sea lions will continue to

frequent Bonneville Dam.  (*Id.* 392 at 5-1.)  These facts suggest that there is not a substantial threat to pinniped viewing activities that would undermine the conclusions reached in the EA regarding tourism and recreation.

Rather, the EA considered tourism and the primary forms of recreation in the area, and plaintiffs do not demonstrate that the proposed action will substantially affect pinniped viewing opportunities such that this analysis was irrational.  For these reasons, NMFS did not act in an arbitrary and capricious manner by not specifically detailing the possibility that there may be some marginally reduced, although not eliminated, sea lion viewing opportunities.

In sum, NMFS prepared an adequate EA, and the conclusions in the EA are reasonable. First, NMFS thoroughly evaluated four alternatives and considered but did not evaluate five other alternatives.  Second, after preparing an initial EA, NMFS accepted public comments and revised the EA.  Third, NMFS assessed and explained the alternatives and their reasonably foreseeable impacts.  Fourth, based on the EA, NMFS issued a FONSI and authorized the states to proceed with alternative three.  This process was adequate under NEPA, and NMFS was not required to prepare an EIS.  Furthermore, NMFS "considered the relevant factors and articulated a rational connection between the facts found and the choice made."  *Balt. Gas & Elec. Co.*, 462 U.S. at 105.  Under APA review, NMFS's ultimate decision is not "arbitrary, capricious, or contrary to law."  Therefore, I GRANT defendants' and intervenor-defendants' Motions for Summary Judgment on plaintiffs' second claim.

## MOTION TO STRIKE

Defendants' argue that plaintiffs' rely on extra-record evidence in their summary judgment brief, and ask the court to strike the documents.  Because I addressed the merits of the argument

PAGE 29 OPINION AND ORDER

related to the potential impacts to Stellar sea lions, I deny the motion to strike as to this evidence.

For this reason, the Motion to Strike is GRANTED IN PART and DENIED IN PART.

## CONCLUSION

Based on the foregoing, I GRANT defendants' and  intervenor-defendants' Cross-Motions

for Summary Judgment (## 73, 76, 80) and DENY plaintiffs' Motion for Summary Judgment

(#67), and GRANT IN PART and DENY IN PART defendants' Motion to Strike (#79).


IT IS SO ORDERED.

DATED this   25th   day of November, 2008.


                                        /s/ Michael W. Mosman
                                        MICHAEL W. MOSMAN
                                        United States District Court

PAGE 30 OPINION AND ORDER